OPINION
Plaintiffs, Porter Drywall, Inc. ("Porter") and Access Drywall Supply Company, Inc. ("Access") appeal from an order of the Franklin County Court of Common Pleas which granted summary judgment in favor of defendants, Olentangy Building Development Company ("Olentangy") and general partners Richard C. Wing, Roger C. Wing and Jacqueline S. Dematteis-O'Brien.[1] Porter and Access advance the following four assignments of error:
 1. The trial court erred when it concluded that reasonable minds could come to one conclusion, and that conclusion was that the plans and specifications clearly provided for a double wall system in all apartments [sic] units.
 2. The trial court erred when it found that the Porter contract had a duty to exclude and then failed to exclude the double wall system in the garden units.
 3. The trial court erred when it found that the Defendants-Appellees were entitled to relief from a breach of contract by the Plaintiff.
 4. The trial court erred when it found that materials ordered from Plaintiff-Appellant, Access Drywall Supply Co., Inc., could be found to be covered under the contract of Plaintiff-Appellant, Porter Drywall, Inc.
On September 12, 1995, Porter, a drywall subcontractor, submitted a proposal to provide materials and labor for the installation of drywall in a ten-building apartment project wherein Olentangy was the owner and general contractor. The apartment project included both one and two-bedroom garden units and two-bedroom, two-story townhouse units. Olentangy provided Porter a complete set of plans and specifications so that Porter could prepare its bid. The plans and specifications were prepared by architect Donald R. McCartney.
Porter analyzed the plans and specifications for the project in preparing its bid. Porter's written proposal incorporated the provisions of AIA Document 401, entitled "Standard Form of Agreement Between Contractor and Subcontractor," which in turn incorporated the plans and specifications. In addition, Porter's proposal contained the following pertinent language: "* * * subject to the clarifications and qualifications contained herein, Porter will furnish all labor, material, equipment and supervision necessary to complete the drywall and related work in accordance with specification sections and these specific drawings * * *." Under the "clarifications" section of the proposal, Porter set out the unit price breakdown for the project. Pricing for the garden units included the following notation: "One hour fire separation walls — one layer 5/8" F.C. hung and taped each side of truss at tenant separation wall[.]" Pricing for the townhouse units included the above-referenced notation, as well as the following additional notation: "Double wall system — one layer 5/8" F.C. hung and taped each side of tenant separation wall from 1st floor to roof deck[.]"
On February 1, 1996, Olentangy accepted Porter's bid, which totaled $134,745. On July 17, 1996, the parties agreed to a written change order in the amount of $604.80, thereby increasing the total amount of the contract between Porter and Olentangy to $135,349.80.
During the course of construction, it became apparent to Richard C. Wing, Olentangy's primary representative to Porter on the project, that Porter had not delivered enough drywall to complete the installation of a double drywall system in the garden units. Wing met with Robert E. Porter, vice-president of both Porter and Access, to discuss the problem. After reviewing the plans and specifications, Mr. Porter stated that he had missed the double drywall system in the garden units and would "take care of it — I'll eat it." Despite Mr. Porter's admission, Porter did not install it. As a result, Olentangy ordered additional drywall from Access and incurred additional labor costs in installing the double drywall system in the garden units.
Over the course of the project, Porter submitted draws on the $135,349.80 contract amount of which Olentangy paid a total of $125,620. Olentangy paid Access $10,309.71 of the $14,798.45 amount billed by Access.
On August 8, 1997, Porter and Access filed a complaint alleging breach of contract due to Olentangy's refusal to pay the balance owed on the written contract with Porter and the alleged oral contract with Access. The complaint demanded judgment under the Porter contract for $9,729.80, plus interest and attorney fees, and under the Access contract for $4,490.84 plus interest.
On September 2, 1997, Olentangy filed an answer and counterclaim, asserting that Porter breached its contract "by failing to provide the materials specified, failing to timely install the work and other shortcomings." The counterclaim demanded judgment in the amount of $6,150.[2]
Porter and Access filed a motion for summary judgment, arguing that Porter interpreted the plans and specifications to include a double drywall system in the townhouse units, but to exclude a double drywall system in the garden units. Porter further argued that based upon this interpretation, it specified in its proposal that the double drywall system would be installed in the townhouse units and included the cost of such a system in its proposal; in contrast, Porter excluded references to a double drywall system for the garden units and did not include the cost of such a system in its proposal. Accordingly, Porter argued that it was not obligated to supply labor and materials for the double drywall system in the garden units and that Olentangy owed Porter the amount set forth in the complaint. Regarding Access's claims against Olentangy, Access argued that Olentangy ordered the drywall it used to install the double drywall system in the garden units pursuant to an oral contract with Access, paid a portion of the debt incurred in that transaction directly to Access, but failed to pay the remaining balance.
The summary judgment motion was supported by the January 22, 1998 affidavit of Robert Porter, who averred that Access entered into an oral contract with Olentangy to provide drywall and related materials for the project, and that the balance due on the account was $4,490.84. The motion was further supported by the affidavit of Melinda Barnhard, Porter's Office Accounts Manager, who averred that the balance due under Porter's contract with Olentangy was $9,729.80.
Olentangy filed a memorandum in opposition to Porter's motion and a cross-motion for summary judgment, arguing that pursuant to both the plans and specifications and Porter's proposal, Porter was obligated to provide labor and materials for a double drywall system in all of the units, including the garden units. Olentangy's motion was supported by the February 9, 1998 affidavit of Richard C. Wing, who averred that the floor plans for both the townhouse and garden units depicted the double drywall system by using double wall lines and that the cross-section on page 13 of the plans and specifications also illustrated the double drywall system.[3] Wing further averred that Olentangy understood Porter's proposal to include pricing for the supply and installation of drywall for a double drywall system in both types of units.
Wing also averred that Olentangy had never entered into a contract, either written or oral, with Access; that all of Olentangy's contact and communication regarding the project was with either Robert Porter in his capacity as vice-president of Porter or Dave Kelly in his capacity as Porter's supervisor; that Robert Porter never indicated that he was representing or dealing on behalf of Access; that Olentangy's payment of invoices directly to Access were made pursuant to Olentangy's belief that Access and Porter were one entity and, therefore, payment to Access was payment on the Porter contract; and that Access and Olentangy share the same address, post office box, telephone number and logo.
In further support of its motion, Olentangy attached the affidavit of architect Donald R. McCartney, in which he averred, in relevant part, the following:
 4. The plans plainly show a double wall drywall system as to all units — both garden (ranch) and townhomes.
 5. The floor plans on the plans shows a double wall system by virtue of the double wall lines shown.
 6. The plans on page 12 under "Division 9 Finishes" 9A Gypsum Drywall show that type WR or water resistant drywall (commonly known as greenboard) were to be installed in all bath walls and ceilings.
 7. The plans on page 13 under the note captioned "GYPSUM WALLBOARD, TWO WALL ASSEMBLY, WOOD STUDS" specifically describes the double wall system to be installed as follows:
 GYPSUM WALLBOARD, TWO WALL ASSEMBLY, WOOD STUDS Base layer +" type X gypsum wallboard applied at right angles to 2x4 wood studs 16" o.c. with 6d coated nails, 1 7/8" long, 0.0915" shank," heads, 16" o.c. Face Layer 1/2" type x gypsum wallboard or veneer base applied at right angles to studs over base layer and to top and bottom framing with 8d coated nails. 2 3/8" long, 0.099" shank, 9/32" heads, 8" o.c. Face layer joints and edges staggered 24" o.c. over base layer joints and edges. Single inner layer +" type x gypsum wallboard or veneer base applied parallel to studs and to top and bottom framing with 6d coated nails. 1 7/8" long, 0.0915" shank," heads, 8" o.c. Second wall duplicate of first wall and separated by 1" space. Walls independently loaded. (Achieved 59 STC with 3 +" glass fiber friction fit in stud spaces both sides (LOAD-BEARING).
 8. The plans, again on page 13, in note 17, gave further detail on the double wall system as follows:
 17. GYPSUM PANELS — APPLY STANDARD GYPSUM PANELS TO BOTH SIDES OF STUDS, WALLS AND CEILING COMMON TO GARAGE AND LIVING AREAS. STAGGER JOINTS ON OPPOSITE PARTITION SIDES. FASTEN PANELS WITH 1" TYPE S SCREWS SPACES 12" OC, AS PER U.S. GYPSUM SPECS. INSTALL WITH PERF-A-TAPE SYSTEM, CORNER BEADS. JOINT AND CORNER REINFORCEMENT AS PER UNITED STATES SYPSUM SPECIFICATIONS. SEE ROOM FINISH SCHEDULE OR PLANS. WHERE FIRE SEPARATION CONSTRUCTION IS CALLED FOR 5/8" FIRECODE `C' AS PER ASTM C36 (TYPE X).
 This note 17 specifically was referenced to the typical wall section on page 13, which was relevant to all units, both ranch and townhomes.
 9. The clear intent of the plans was to require that a double wall drywall system be furnished and installed. This should have been apparent to any bidder reviewing the plans.
In its memorandum contra Olentangy's cross-motion for summary judgment, Porter argued that the clarification section of its proposal specified that the townhouse units would include both a one-hour fire separation wall and a double drywall system, while the garden units would include only a one-hour fire separation wall. According to Porter, by expressly stating that the double drywall system was included in the townhouse units, it was implied that the double drywall system was excluded for the garden units.
Porter also argued that Olentangy's plans and specifications were unclear and ambiguous. Specifically, Porter argued that the cross-section drawings on page 13 of the plans depicted a double drywall system on only the two-story townhouse units; however, the architect confused the issue by identifying the cross-section drawings with conflicting notations?"Gypsum Wallboard, Two Wall Assembly" (indicating a double drywall system) and "1 HR TSW" (indicating a single drywall system).
Finally, Porter argued that Olentangy's counterclaim for expenses incurred in installing a double drywall system in the garden units was without merit because such installation was not required by the contract.
In support of its arguments, Porter attached the February 16, 1998 affidavit of Robert Porter, who averred, in pertinent part, as follows:
 4. The plans and specifications for this project are the worst I have ever seen.
 5. There was no specification book provided with the plans on this project.
 6. "1 HR TSW" is the symbol for a One Hour Fire Resistant Tenant Separation Wall.
 7. A "1 HR TSW" is a single wall system consisting of 5/8" Fire Code drywall attached on each side of the wall, and is entirely different from a Double Wall System.
 8. Based on the fact that the cross-section drawing in the plans and specifications for this project show a two story building, it was reasonably inferred that a Double Wall System was provided for the Two Story Townhouses Only.
 9. There were no other cross-references or indicators in the plans and specifications to suggest that the Double Wall System would be included in the Garden Unit Apartments.
In its reply in support of its cross-motion for summary judgment, Olentangy noted that Porter had failed to rebut Wing's testimony concerning Robert Porter's admission that he had missed the double drywall system in the garden units when initially preparing the bid and would absorb the cost of the bidding error. As to Porter's contention that the plans and specifications contained ambiguities, Olentangy asserted that Porter was obligated to seek clarification from either the architect or Olentangy regarding the alleged ambiguities. Olentangy's reply was supported by Wing's February 24, 1998 affidavit. In his affidavit, he attested that Porter had never sought clarification of any alleged ambiguities in the plans and specifications and that the first time he became aware that Porter had misinterpreted the plans and specifications was at the meeting with Robert Porter wherein Porter indicated that he missed the double drywall system in the garden units and would absorb the cost of the bidding mistake. Olentangy's reply was further supported by the February 27, 1998 affidavit of McCartney, which stated, in pertinent part, as follows:
 4. The double wall line on the floor plans for both the garden and townhouse units illustrate the double wall system. With respect to the cross-section of the double wall system bound on page 13 of the plans and specifications, the notation underneath that cross-section states "1 HR TSW." This notation stands for One Hour Tenant Separation Wall and in no way is an indicator of whether or not the wall is a double or single wall system. The type of wall system can be determined by looking at the cross-section itself and the specification above the cross-section. The notation is to reflect that the cross section [sic] is in fact a tenant separation wall unit and should have a minimum fire rating of one hour.
 5. The cross-section on page 13 of the plans and specifications illustrates the double wall system to be installed in both the garden and townhouse units which were the subject of the plans.
In a decision filed on October 16, 1998, the trial court found that no genuine issue of material fact existed which would warrant the case being presented to a jury. Specifically, the court found that the plans and specifications provided for a double drywall system in all of the units. Accordingly, the court held that Porter was "obligated to supply all the labor and materials for installation of the double drywall system in the townhouse units and the garden units of the project pursuant to its contract with [Olentangy]." Regarding Access's claims, the trial court found that Access had failed to set forth any evidence to support a finding that an oral contract existed between Olentangy and Access, and that it was reasonable for Olentangy to assume that any payments made to Access were payments toward the Porter/Olentangy contract.
A journal entry memorializing the court's decision was filed on November 25, 1998, reserving the issue of attorney fees and damages for a hearing before a magistrate. Porter and Access filed a premature notice of appeal on December 18, 1998, which was ultimately dismissed by this court on January 25, 1999. Pursuant to an "Agreed Journal Entry as to Damages" filed on March 3, 1999, Porter was ordered to pay Olentangy damages of $6,177.71 plus interest; attorney fees and expenses totaling $19,677.86 plus interest; and court costs. Porter and Access have filed a timely appeal.
As the first, second and fourth assignments of error relate to the granting of summary judgment, this court will address them together.
The measure by which summary judgment is granted is set forth in Civ.R. 56(C), which provides, in relevant part, as follows:
 "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * *
A genuine issue of material fact exists whenever the relevant factual allegations in the pleadings, affidavits, depositions, written admissions or written stipulations of fact are in conflict. Duke v. Sanymetal Products Co. (1972), 31 Ohio App.2d 78,81.
In reviewing a trial court's disposition of a summary judgment motion, an appellate court applies the same standard as that applied by the trial court. Maust v. Bank One Columbus, N.A.
(1992), 83 Ohio App.3d 103, 107. An appellate court reviews a summary judgment disposition independently and without deference to the trial court's determination. Brown v. Scioto Cty. Bd. OfCommrs. (1993), 87 Ohio App.3d 704, 711. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously, with any doubts resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-359. "[T]he purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist."Viock v. Stowe-Woodward Co. (1983), 13 Ohio App.3d 7, 15.
By the first and second assignments of error, Porter argues that the trial court's grant of summary judgment was improper as to whether the plans and specifications clearly provided for a double drywall system in the garden units and as to whether Porter contracted to provide such a system.
In its complaint, Porter asserted that it interpreted the plans and specifications to exclude a double drywall system in the garden units and, therefore, did not include the cost of such a system in its proposal. By its answer, Olentangy asserted that it interpreted the plans and specifications to include a double drywall system in both the townhouse and garden units, and believed that Porter's proposal included pricing for such a system in both types of units.
Both Wing and McCartney testified that the floor plans and cross-section drawings illustrated that the double drywall system was to be installed in both types of units. Wing further testified that the cross-section notation "1 HR TSW" (One Hour Tenant Separation Wall) was no indication of a double or single wall system. In contrast, Robert Porter testified that because the cross-section drawings depicted only the townhouse units, Porter understood that the double drywall system was to be provided only in the townhouse units. Porter further testified that the plans and specifications contained no other cross-references or indicators to suggest that the double drywall system was to be included in the garden units. Porter also testified that the "1 HR TSW" notation on the cross-section drawings symbolized a single wall system.
Upon review of the evidence, we find that the factual allegations contained in the parties' pleadings and affidavits clearly conflict as to whether the plans and specifications called for the installation of a double drywall system in the garden units and whether Porter contracted to provide such a system. Because genuine issues of material fact exist as to these issues, the trial court erred in granting summary judgment.
With regard to Porter's fourth assignment of error, we find that the trial court erred in granting summary judgment in favor of Olentangy on Access's claim for payment on its alleged oral contract with Olentangy for the provision of drywall materials. As noted previously, the trial court found that Access failed to set forth any evidence to support a finding that an oral contract existed between it and Olentangy. We disagree. The factual allegations contained in the summary judgment materials provided by the parties clearly conflict as to whether Olentangy and Access entered into an oral contract. Robert Porter testified that Access entered into an oral contract with Olentangy to provide drywall materials for the project; in contrast, Wing testified that no contract, either written or oral, ever existed between Access and Olentangy.
Further, the trial court's finding was based, in part, on its conclusion that Porter was contractually obligated to provide the labor and materials for the installation of a double drywall system in the garden units and that Olentangy's purchase of materials from Access to complete that portion of the project was made pursuant to the Porter/Olentangy contract. Having determined that genuine issues of material fact exist as to whether or not Porter was responsible for the installation of the double drywall system in the garden units, we conclude that summary judgment was improper as to whether or not Olentangy separately contracted with Access for the provision of drywall materials. Based upon the foregoing, the first, second and fourth assignments of error are well-taken.
By the third assignment of error, Porter contends that the trial court erred when it found that Olentangy was entitled to relief from a breach of contract by Porter. Specifically, Porter argues that Olentangy failed to provide the required written notice of Porter's alleged breach prior to asserting a claim for damages.
A review of the record indicates that Porter did not raise this argument in its motion for summary judgment or in its response to Olentangy's motion for summary judgment; consequently, the trial court did not address nor rule upon this issue. It is well-settled that issues not initially raised in the trial court may not be raised for the first time on appeal. Stevens SkinSoftener, Inc. v. Revco Drug Stores, Inc. (1997), 121 Ohio App.3d 212,218. "A party may not assert a new legal theory for the first time before an appellate court." Ohio Farmers Ins. Co. v.Estate of Brace (1997), 116 Ohio App.3d 395, 401, quoting AMF,Inc. v. Mravec (1981), 2 Ohio App.3d 29, 32. As this issue was not properly raised by Porter in the trial court, we decline to consider it for the first time on appeal. Accordingly, the third assignment of error is not well-taken.
For the foregoing reasons, the first, second and fourth assignments of error are sustained, and the third assignment of error is overruled. Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed and cause remanded.
BRYANT, J., and BOWMAN, P.J., concur.
[1] Where appropriate, defendants Olentangy Building and Development Company, Richard C. Wing, Roger C. Wing and Jacqueline S. Dematteis-O'Brien will hereinafter be referred to collectively as "Olentangy."
[2] This figure represents an alleged overpayment in the amount of $577.71 and costs incurred for labor Olentangy had to perform to install the double drywall system in all of the units, as well as additional expenses incurred as a result of Porter's improper installation of greenboard in the first garden unit constructed.
[3] Attached as "Exhibit 2" to Wing's affidavit is a complete set of the project plans and specifications.